The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. You may be seated. Our final case today, United States v. Ordonez and others. Mr. Berman. Good morning, Your Honor. I'm Stuart Berman, appointed by the Court to represent Jose Domingo Ordonez-Zometa. I'd like to use my time here to address the interstate commerce issue. This Court has been hearing MS-13 conspiracy cases for 15 going on 20 years. Those cases usually involve a pretty sprawling range of conduct. Here, we're at the opposite end of the spectrum. We have a single homicide in Prince George's County, events that really took place over just two days in 2019. Can I ask you to zero in on what I think is the biggest problem for you? You seem to assume that the crime has to affect interstate commerce, but doesn't the statute say the enterprise has to affect interstate commerce? Agreed, Your Honor. And how do you agree with me there's testimony that members of this enterprise send money outside the country? Well, Your Honor, I agree. No, that's a factual question. That's a yes or no. Is there evidence that members of this enterprise routinely send money outside the country? There is testimony from Mr. Martinez-Ramirez, also known as Killer, who testified in a very vague way that money was sent to El Salvador to help prisoners and also to buy weapons. Okay, so why is that not just ballgame? Because I assume the jury believes that testimony, which means that members of this enterprise send money to El Salvador as part of the enterprise. And now it seems very obvious to me this enterprise affects interstate commerce. Well, Your Honor, what I would submit here is that we don't have any dates, we don't have any times, we don't have any amounts, we don't have any details. Why does any of that matter if the question is whether the enterprise affects commerce? Well, even under this Court's de minimis test, I would submit that we need something more than this very vague testimony that at some uncertain time, in some uncertain place, in some uncertain amount, that some kind of unknown amount of money was sent. These all strike me as great questions that could have been asked in cross-examination. Well, Your Honor, I would submit that the government, to meet the de minimis test, was required to prove something more. It was required to show some kind of documentation from the bank or from Western Union or El Salvador, which has adopted cryptocurrency, some evidence from a crypto platform. And, of course, there's no testimony that any of this money had anything to do with any racketeering activities by either the— It doesn't matter. It matters whether the enterprise affects commerce. Well, I understand the Court's point. I just think there are real limitations— Wait. Hold on. The testimony at JA907 is, did you pay any money to be in the clique? Yes. What? At first $200, then later $100 a month. And who did you pay that money to? It was given to the leaders. What was the money for? The money was sent to El Salvador to help prisoners and also buy weapons. Why isn't that testimony that this enterprise affects commerce? Your Honor, I understand the point, and I understand the limitations of the de minimis standard, and I understand I'm here on a sufficient— So $100 a month is de minimis? $100 a month is de minimis? Well, again, Your Honor, I suggest that something more was needed in order to fully establish the interstate commerce aspect under Morrison to show that this homicide was somehow directed at the instrumentalities and channels and goods. And I understand Your Honor's point that we're focusing on the enterprise as opposed to the specific offense. What I would submit more broadly, Your Honor, is that most of these MS-13 racketeering cases, most recently Baronet, there's usually a combination of factors. For example, in Baronet, there are guns manufactured outside of Maryland, drugs that came from outside of Maryland, extensive use of phones. And here the government attempts to present a similar sort of combination platter, but I think that it simply doesn't work. Not just the money, but the marijuana. The only evidence about the marijuana was that one person sold some unknown quantity of marijuana in New Jersey, and the government didn't establish that there was an interstate character to that. The call to Pinguino, we have no testimony about who Pinguino truly was or that he even exists. No phone records to corroborate that call, even though the government presented an extensive cell phone analysis from Special Agent DeJesus. The government introduced evidence that they didn't rely on a trial, but rely on here about Uber, and I submit that that event simply proves that Uber operates interstate commerce, not that this clique did. And finally, the government at trial, but to its credit, not in its brief, references the movement of the corpse from Maryland to Virginia. I would submit that a corpse was not a good, and Congress has recognized itself, and the courts interpreting the kidnapping statute have recognized it. And the vast panoply of things over which Congress has chosen to exercise federal jurisdiction, corpses are not one of them. So I would submit that collectively, none of these, I would submit that individually, none of these little fragments on its own proves interstate commerce, and I would submit that collectively they don't either, and that the court should reverse on counts one through three for failure to move that element. Thank you. So throughout those three counts, that's what you want us to do? Those three counts, Your Honor, I think the government correctly points out in its brief that count four doesn't have an interstate commerce element and wouldn't be affected by that argument. All right. Thank you very much. Mr. Berman. Mr. Orenberg. Good morning, Your Honors. Good to have you here. Alan Orenberg on behalf of Jose Ortega Ayala. On behalf of Mr. Ayala, I am challenging the district court's decisions to suppress the evidence at the motions stage because the three search warrants that, as I have laid out in my briefs, were so lacking in indicia of probable cause as to render it unbelievable that you could find the existence of probable cause in these cases. In the first two search warrants for the Facebook accounts of my client, the officer merely relied upon . . . I guess you could call it the tip, if you will, of a witness and then was somehow led to a profile picture and then in turn got to the Facebook page. In our view, that's not enough. The district court made a mistake and was clearly erroneous when it said that that was enough. I don't believe that this court . . . and then once that happened, of course, the search was overly broad and the officers asked for a search warrant that spanned some 14, 15 months, not just for the month of March 2019 or perhaps just a month or two before March of 2019. This should lead this court to conclude that this was some sort of open-ended warrant and that this is not allowable, as I have laid out in my briefs in the case law, and that the district court made a mistake when it said that the search warrants for the Facebook accounts should be suppressed. Now, the motion to suppress the search of the residence was based on a slightly different basis. This, again, starts with the officer getting some information and goes to Uber and sends a search warrant to Uber to get the records of some sort of transportation that allegedly my client made in March of 2019. Then, based on that, they go to the home and they find my client. Well, again, there was nothing in that warrant that clearly should have led the district court to conclude that there was evidence of a crime to be found in that particular place. I mean, again, the district court erroneously relied upon the warrant or granted the warrant and erroneously relied upon the facts that supported that warrant. Didn't the warrant say that he took the Uber home after the murder? Yes, that's what the murder did. Almost obvious beyond belief to imagine that a place that a person went right after a really violent murder might have evidence relating to that murder. Well, first of all, he didn't take it from the murder scene. He took it from another home. Okay. He went with others to another place and from that home. Okay, but it doesn't really feel like a far stretch that when a person goes home after having been involved in a violent murder that there might be evidence in their home of that murder. Well, Your Honor, there was nothing in the record that showed that there would have been. Clothes, the things he was wearing, hypothetically say? All they said was that the Uber record showed that he moved from position A to position B. It did not specify with particularity that we believe that there are instrumentalities of the crime. The court doesn't have any more questions. Did you try the case? No, I didn't, Your Honor. We appreciate your work. Thank you, Your Honor. Mr. Byrne? Good to see you, Mr. Byrne. Good to be back, Your Honor. May it please the court, my name is Jonathan Byrne. I'm here this morning on behalf of Jose Henry Hernandez-Garcia, one of the defendants below. Question, did someone tell you to change the time in your final report? Answer, yes, sir. Question, who told you? Answer, it was someone from the investigative team. They said to narrow down the time. Presented with a new trial motion based on a government witness's testimony that he changed an expert report at the behest of other investigators to bolster their case, the district court abused its discretion by not weighing in on its own on the credibility of the government's witnesses and its case sitting as a 13th juror as this court has required. I'm a little confused about your argument. You agree with me that the district court recited the correct legal standard, right? Yes. And your argument is essentially that the district court was, and you agree the district court having recited the legal standard denied the motion, right? Correct. And your challenge as I, well, I read your challenge basically as to the fact that the district court did not explain why it was denying the motion. But I was on a case like this a while back, but I also looked through your brief. I don't see any cases saying district courts have to explain why they're denying the motion. Do you know any case that says that? I'm not aware of a case specifically, Your Honor, but there is some explanation in this case. But the explanation is the jury was aware of all this. Therefore, I'm not going to say. Right, that's an explanation to deny a Rule 29 motion. Well, that's my point. Right, but the district court, so why don't I just interpret what the district court said is I'm denying the Rule 29 motion for this reason. I then on the Rule 33 motion, I state the correct legal standard, say motion denied. And then it seems to me you just have to identify some legal basis for the proposition the district court has to explain its reasoning. And I'm not aware of any case, I'm not aware of any provision of the Federal Rules of Criminal Procedure, that requires the district court to explain its reasons for denying a Rule 33 motion. Your Honor, I believe when the district court made its ruling that it did state with specificity on the Rule 33 motion that that argument had been presented to the jury and it was going to defer to the jury's finding. I don't think that was just on the Rule 29. And that's the error here because Rafikian was very clear that Rule 29 and Rule 33, they're different standards. And it's an important distinction in this case because the government's case against my client basically arose and fell on two witnesses who were perpetrators of this offense who cut deals to testify at trial. And they were, to their credit, pretty upfront that they were testifying to make life easier. But credibility issues are for the jury normally. Yes, Your Honor, and under Rule 29, the defendant is stuck with the district court reviewing that in the light most favorable to the government. But under Rule 33, Rafikian says the district court sits as a 13th juror on new trial motions. And so when the new trial motion is the government's case rises and falls on these two witnesses, the only corroboration is this report prepared by the FBI agent, Agent DeJesus, in which he admitted, I changed the report because the investigative team said we needed to narrow that timeline. I mean, that is a government witness saying, I changed the report to make our case better. That should raise alarm bells about the nature of the government's case. And so these two witnesses, as I said, were very upfront that they were trying to get themselves out of this in the best way they could. They admitted that they lied repeatedly in their statements about this case. One of them, Mr. Martinez-Ramirez, said, I was trying to help myself. Changing my story, I was trying to help myself. And so the district court, in ruling on the Rule 33 motion, should have dove back into that and done more than this was presented to the jury, and I'm going to leave it with that. Were you involved in the trial? No, Your Honor. We appreciate your work, but you've got some rebuttal time. Yes, sir. Thank you. Thank you. Mr. Rodker? Good morning, Your Honors, and may it please the Court. Michael Rodker from the Department of Justice on behalf of the United States. I think what I'll do is just address the issues in reverse order, so I'll start with the issue about the new trial motion, then we'll get to the warrants, and then I'll conclude with the sufficiency. We'll do it however you prefer. Thank you, Your Honor. On the issue of the new trial motion, let me say, the question about altering the report, it was fully disclosed at trial. It is not uncommon for experts to prepare draft reports that have maybe more data or that go beyond the relevant time frame, so there was nothing below board here. Everything was fully disclosed to the defense. The removal of the data point in question was the subject of cross-examination of the expert, and, in fact, in closing argument, the defense counsel, not Mr. Byrne, but the trial counsel specifically said that that omitted data point should be considered because it gives him an alibi for the crime. The jury heard all of that, and the jury decided to convict, and the question on appeal now is whether the district court somehow mangled it when it denied the new trial motion, but it didn't, Your Honor. This whole idea about having to reweigh the evidence, first of all, the defense in their new trial motion didn't ask for a reweighing. The court's cases don't mandate that a district court reweigh, and as far as the adequacy of the explanation, Judge Heitens, as you pointed out, the district court did say it was simply an oral ruling that was right before the sentencing. It said, Mr. Walsh-Little, you raise a good point. You raised it in front of the jury with respect to whether some of the cell site information placing your client's phone at the scene is reliable or not, but the jury heard it, and I just don't see how that alone can justify a Rule 33 new trial motion, so I'm going to deny that motion by the ECF. And so when you say you're interpreting when the district judge says that alone, in your view, what the district court is saying, how this point, what the district court just called a good point alone is not enough.   Yes, and again, it's an abuse of discretion standard, and I would just also say a lot of times the court, district courts and this court as well, will see new trial motions that are based on new evidence. We don't have any new evidence here that would even require any sort of reweighing. Oh, I thought you were going to say this court frequently sees rulings on Rule 33 motions that consist of denied, nothing else. Yes, I'm sure it does. But again, as far as the question about whether some reweighing was mandatory, if you have new evidence, perhaps I could see that there's more... Did you try the case? I did not, Your Honor. We don't have anybody here who tried the case. No, we're all new. You guys are the same box we're in. Just like the court, we're all relying on a cold record. If the court has no further questions about the new trial motion, let me work... You can go ahead however you want to do it. Let me turn to the question raised about the adequacy of the warrants. I have three basic comments. Which warrant are you talking about, all of them? All three of them, because my argument applies to all three. First of all, Your Honors, Mr. Ortega-Ayala, as far as we're aware, he has not identified any evidence that was seized as a result of these warrants that was then introduced against him at trial. So even if you agreed that the warrants were defective, and even if you found that there was no good faith, I don't see what he's asking to be suppressed. So for that reason alone, I just don't think that there's any kind of issue there. He may want to dispute the warrants. It might be a nice academic question. But in terms of this case, I just don't see... He hasn't identified, and we're not aware of any evidence that was uncovered during those searches that was then admitted against him. And so for those... Is that argument in your brief? Yes. Okay. I may have missed it. There's a lot of moving parts in these cases that I might have missed. I believe it's in the brief, Your Honor. Fair enough. I should qualify that. We're all trying... Yes. But if it's not, I would still say that, again, it's a deferential standard that this court... You did write the brief. I did write the brief, so I'm responsible for that. And you did a good job with the brief. Thank you, Your Honor. Maybe to help, just to say that this is a murder case relating to M13 or whatever it's called, down in Central America. But we've got a bunch of students back here. Oh. So they know what is going on a little bit. But no, I'm just mentioning that. It's a murder case involving M13. It's in Central America and El Salvador. We'll put it in context for them. Yes, certainly. And you're the lawyer for the Justice Department that are defending the government's prosecution and saying the guilty verdicts in the sentences should be sustained. Thank you, Your Honor. That's a very apt summary. But as Your Honor pointed out, that is not the trial counsel. Again, so at a minimum, Your Honor, our defense is that the district... I didn't want to point that out. I wanted to know it for my own information. Understood. Understood. Our bottom line, though, is, again, the good faith exception would apply. And again, if you look at the record here, you'll see that the district court identified a number of reasons. Your Honor, Judge Huytens, you pointed to one with respect to why it might be reasonable to believe there was evidence of the murder at his home. The district court adopted similar analyses. So we don't think there's any basis for suppression, certainly no basis for throwing anything out. Can I ask you about the thing that troubles me most in this case? Please do. It's a law enforcement officer telling someone who's being interrogated that it's going to look real bad if you don't talk to me. Can we at first... I mean, you agree this is your brief, but can we agree, I guess, in open court, on the record, that is a really bad thing and you should not under any circumstances do that? Yes, and I would even go a step further and say that I think Your Honor understated what the officer told him. It wasn't just how you characterized it, but I think he basically told him, I can comment on your silence. Yes. Legally incorrect, totally inappropriate. Totally inappropriate, not defending it at all. I agree with you. It was improper. It should not have been done. However, the question then becomes, how do you factor that into the voluntariness calculus? Our position is... And the reason for that, just to make sure I... This person was Mirandized. Yes. And there's no question about the validity of the Miranda Waiver. Not on appeal. There was below. Right, but for us, we're just... As it comes to this court, there's no question the Miranda Waiver is valid. Okay. So then the only... So as we pointed out in our brief, it's exceedingly rare for there to be a situation where you have a valid and informed Miranda Waiver, but statements nonetheless are deemed involuntary. As Your Honor pointed out, and as we have conceded, there is a negative fact in this record in terms of what was told. But the Supreme Court has said that even misrepresentations by themselves and without more, there's no per se rule that they categorically render a subsequent statement involuntary. The district court applied the totality of the circumstances. It looked at all the facts in the record, and it found, on balance, it said... I believe the words the court used were that the misstatement about the Miranda warning was not a good fact for the United States, but nonetheless, it said, on balance, it doesn't outweigh the other factors. Is that a misstatement? Is that... That's... Well, I know that they... The court says... There's plenty of precedent to say, so they can lie to you. Police say, well, you know, we have five people that say they saw you do this. And, of course, the courts have said that's fine. But here now, this is different. I know. This is saying... Wait a minute. You know, I can use your silence against you and tell the juror that you didn't talk to me. Right. That's not a misstatement about facts. That's really telling him that's what's going to happen at your trial. I'm going to be able to get on the stand and tell these jurors that he was silent. That's...  So you're saying that... Go and... It's just a matter of just, what, do nothing to that? That's all? Well, Your Honor, I agree with you that it's a different kind of misstatement. I guess the way I would think about it is many of the cases involve misstatements of facts. So you're co-defendant could... This is a misstatement of law. That's the way I would think about it. It's not a misstatement of law. It's coercive. Well, I don't think it is inherently coercive. Again, there's no per se rule that it's coercive. How in the world would that not be coercive? Listen, you can remain silent. I've told you that. You have a right to do that. But I can tell them... I understand. I can put you at trial when I tell them you remain silent. That's not coercive? It's not coercive because I think you have to look at it in context of the entire interview. And if you look at the context of the entire interview... Well, it shouldn't have been done. We all agree with that. I'm agreeing with that. It's a question of whether it has any impact on this prosecution. It is a relevant circumstance that this court, like the district court, should take into account in deciding voluntariness. But our view is it's not inherently coercive. And Judge Gregory, part of the reason why we're taking that position... If you look at this, the transcript of the interview, this is a defendant who wanted to speak. He was willing to speak. He spoke for many pages and many hours before we got to this misstatement. But clearly, he was trying to get in good with the detective. He wanted to know what his options were. This is not a situation where you had a reluctant witness who didn't want to talk, and the cop said, Hey, look, if you don't talk, I'm going to come forward and tell them you didn't talk. This is someone who wanted to talk. Did the misstatement factor into his decision to speak? Perhaps. We don't know. But what we do know is, as a legal matter, that misstatement alone is not inherently coercive. It didn't overbear his will as a matter of law when all the other facts in the record suggest that this was voluntary. He was willing to speak. So I think you have to look at it from that standpoint. And the one thing we do know, as far as the outer limits, under the Supreme Court's decision in Frazier v. Cup, and this court's 2012 decision in it's either Whitefield or Whitehead, White something, that there's no per se rules here. We have to look at the totality. The district court did exactly that. It weighed the factors that supported a voluntary misfinding against the ones that supported the negative misstatement. So can you walk me through how you'd analyze a hypo that, this is bad, but a hypo that would trouble me even more? Imagine that an officer comes in and basically literally negates the Miranda warning. Say, yeah, yeah, yeah. My partner gave you these warnings, and yeah, yeah, yeah. But everything, that was all BS. That was all BS, buddy. Anything, you know, and just, so how would you analyze a situation? I mean, I know courts would probably analyze that as voluntariness, but I think what I struggle against is voluntariness doesn't seem like a good fit. It's more like you're negating the Miranda. So how would you analyze a situation like that, where, and I'm positing this isn't that case. How would you analyze a situation where what the officer said instead was all that Miranda stuff was a lie? Right. That's a good question. Whether you would view it through a voluntariness lens or whether it would have some other, I don't know. I don't know where it would go doctrinally. Yeah, something under the Fifth Amendment or, but, you know, again, part of the premise, and I understand you're not saying this is this case, but part of the premise here is that it's even more difficult to show involuntariness because we have a valid Miranda waiver. If you have misinformation about a Miranda, you would take that sort of bedrock, that threshold point out of the case, and then maybe the standard wouldn't be as strict for finding involuntary in your honors hypothetical. But let me also just, I want to just pivot to an important point. Even if the court were to decide that the statement was coerced, and I submit it should not, but even if you were to find it or you were to just choose to bypass the issue, any conceivable error in admitting that statement would have been harmless on the facts of this case. And the reason why is we had overwhelming evidence that Mr. Ordonez Zameda was involved in every aspect of this horrific crime. He is the one at the very beginning that summoned everyone to his home. He is the one that told the juvenile to bring his papers because he suspected that he was snitching and talking to the police. When they were at his home and they were partying before the murder happened, he is the one that spoke on the telephone to Pinguino, the MS-13 leader in El Salvador, who subsequently green-lighted the murder. After that phone call, Ordonez Zameda was the one... The murder was green-lighted from El Salvador by the boss man in El Salvador. A boss man, yes. And this is the key guy in the U.S. that you're talking about. You're saying... Yes, yes. You're saying he's the key guy of these three. Yes, he was the point of contact, correct. And then... By telephone. By the telephone. They did it by telephone. By the telephone. And then once he got the order to green-light, he then told his two co-defendants and others, one of the co-defendants, to go upstairs and get the murder weapon. And then when they got the murder weapon, he's the one that instructed everyone to torture and mutilate and absolutely maim this juvenile individual who was killed. What did that murder weapon look like? I'm sorry? What did that murder weapon look like? There's a picture of it in our brief, Your Honor, but it's basically a glove that goes over one's hand and it has three blades that stick out from three fingers, kind of like an action figure but a real-life blade. A three-headed blade, if you will. There's a picture of it in our brief, but that's what it looked like. And they took turns. I think the autopsy report determined there was something in the neighborhood of 150 stab and puncture wounds. And then after the murder... And they were killing this kid. He was 16 or so years old or something, because they thought he was cooperating with the police. Correct. And that was mistaken. His interaction with the police was that he was a juvenile runaway. He was not cooperating. Yes. And then the last point, of course, is that after the murder, Mr. Ordonez-Zameda told some of the defendants to stay back and clean up his house, and he told other defendants to put the body in the car, drive it to Virginia, and get rid of it, which, of course, they unsuccessfully attempted to do by setting it on fire. Thankfully, a Stafford County detective was able to locate the body, and because the corpse had not been completely incinerated... The body was burned down along a highway somewhere in northeastern Virginia. Correct. It was on a side road by a campfire. So even if you believe that somehow the statements that he made, which were certainly probative, and we believe he was entitled to admit at trial, you have overwhelming evidence of his guilt, and so any error in the admission of those statements would be harmless. If the court has no additional questions on that, then let me just wrap up. That's the standard here. If the issue is preserved, we have to decide whether it was prejudicial error or harmless error, if it's an error. Yes. If it's an error, then the government's burden would be to prove harmlessness because the issue was preserved. And if it's a harmless error, we can disregard it in considering whether to grant relief to the defendant. Yes. And that's right. Exactly. You've done two. It's three. What about the Facebook? On the Facebook warrant account? It's my same argument, Your Honor, that there's nothing that he identified from the Facebook account, the search of the Facebook account, that was admitted at trial. And in any event, we think the warrant was adequate and the good faith exception would apply. So it's my same argument to all three of the searches, the Facebook, the house, and the cell phone. And what was the connection for the Facebook? The connection for the Facebook was that MS-13 members, according to the affiant, are known in particular for communicating through Facebook. They often post images that may depict tattoos or other paraphernalia, other gang-related memorabilia that would identify them and link them to the MS-13 enterprise. So it was part of this investigation to try to determine who was involved, whether they were MS-13 members. Can I ask you how far this Facebook argument goes? So the hypothesis is we have some reason to believe there's a video of the murder. We have some reason to believe that he has social media accounts. Right. I mean, does that mean you can get a warrant for every single one? You can get his TikTok account, you can get an Instagram, you can get a face. That literally the fact there is, quote, a video and the defendant has social media alone means I can get a warrant for every single one of their social media accounts. Not clear to me, Your Honor. I mean, if there was some evidence to believe that they used each specific social media site, then perhaps there would have been. So I guess how critical is it to your argument that there was at least some evidence that this gang uses Facebook specifically to communicate? I think that's certainly a relevant factor as to why. I mean, obviously, I know that the government didn't do this, and I know Your Honor's not asking, but if there was evidence that they used Facebook and we got a warrant to search TikTok, there would be kind of a disconnect. But here, this is all kind of simpatico with the information that was known to the officers. These criminals were so sophisticated, they videoed the thing, didn't they? There was a report that they did that no video was ever uncovered, but there was testimony that someone had video recorded it, that they had sent it to, I believe, Mr. Odoña Zomeda, and that others were seen watching the video, whether it was deleted, whether that testimony was just incorrect. Which one of them had a good idea? Yes. Which one had the great idea of the video thing, of the criminal conduct? Your Honor, it's in the record. I can't say I can remember right now, and I don't want to falsely attribute it, mistakenly attribute it to someone. If I may, just the last couple of minutes, briefly just address the sufficiency point. Judge Hytens, I think you hit the nail on the head. I don't have much to add. It is focused on the enterprise. Your Honor did quote from page 907 of the joint appendix, which is the relevant testimony from the cooperator. Just the one about the wire transfers, I would also emphasize that there was an expert witness about MS-13 generally, and this is at JA-1169. The witness was asked, does MS-13 send money back to El Salvador? Answer, they do. How is that done? And then the answer is, depending on the click in the program, each specific click has to provide a certain amount of money back to El Salvador, to its leadership, to its chain of command. At times, it can be once a week or once a month. So we have sort of general testimony that this is the practice of MS-13, and then we have the specific testimony that Your Honor referenced in JA-907. And again, as Your Honor also pointed out, many of the questions that my colleague have raised about, well, it's a little too vague, it's a little too nonspecific, that's all fodder for cross-examination. That goes to the weight of the evidence. But here we're dealing with legal sufficiency, and we do think it's sufficient. As the Court also knows, I think the rideshare evidence is also evidence that bears on the commerce connection, and then of course we have the phones as well, and of course the telephone call, in particular, to El Salvador. So we think that it's a de minimis standard, it's a low threshold, and we think that the evidence was more than sufficient. If the Court has no further questions about any of the, if the Court has any questions about any issue, I'm happy to address them, but if there are no further questions, I'm happy to give back my remaining time. Thank you very much, sir. We appreciate your work, too. Thank you, Your Honor. Yes, sir. Thank you. And all of your colleagues at work on this case. And Mr. Berman? Your Honor, if I could respond very briefly to, first, the point on the Uber. You know, this Court has never held that a single car ride or a single train ride across state lines, say an Uber from Virginia to Maryland, a Metro ride from Maryland to D.C., in and of itself proves the interstate commerce element of the Rico or Vicar case. The Government cites one Second Circuit case involving some mob activity up there, but this Court has never made such a holding. And I think it's notable here in that regard that the Government chose not to count, not to charge the counts, to deal with the offenses that directly deal with interstate travel, such as the 1952 Travel Act, interstate travel to commit a crime of violence, or in 1958, interstate travel... If these fellows were traveling all over Virginia and Maryland and District of Columbia, it looks like from this record... Yeah, I don't know the count. The murder was in Virginia, wasn't it? The murder took place in Maryland, Your Honor. In Maryland. But they had traveled around Virginia, and the trial was in Maryland. The trial was in Maryland, Your Honor. With regard to the transmittal of money, I would simply note that the expert witness that the Government relies on was an expert witness from Houston who testified only in the most general way about MS-3B. Was there objections to the expert evidence coming in? No, Your Honor. So this is... Are you challenging it now on appeal? Well, we're on a sufficiency argument, Your Honor. Is this a plain error issue? No, Your Honor. It simply goes to my sufficiency point, which is that this expert didn't have anything to say, really, about the operations of this CLCC in Maryland. And in other cases, such as Zelaya, where the expert actually talks about the CLCC and the community in question, I would simply submit that this expert's testimony isn't worth a whole lot of weight. Finally, Your Honor, and if I could elucidate on this for the benefit of the students here, and Mr. Arnberg has granted me a little bit of his rebuttal time, I think it's worth taking note of exactly what Detective De Leon said so the students here understand the court's concern about his statements. This is an officer who has a defendant in custody. It's after a Miranda waiver. It's during an interview. And he says, because I'm telling you, in these kinds of situations, there's a lot of evidence, and you're going to say that, oh, you only tell me, no, Detective De Leon, I'm not going to tell you anything. Okay, no problem. But when we go to have the case in front of the judge and the jury, A, I'm going to be asking, Detective De Leon, did you have the chance to talk to Jose clearly? What did he tell you? He told me he didn't want to talk. You're a juror hearing that. How are you going to look and how are you going to think about the person that says, no, I'm asking, how are you going to look at that person? In a good light or a bad light? That's Joint Appendix 2002-2003. We understand the government's harmless argument. We have not challenged the sufficiency of the evidence that the murder occurred. But this is classic conduct that is pressure, rough language, tricks, treats, inducements of the sort that the court condemned in Vance v. Borden-Kercher. And even if the court affirms the convictions here, we would ask that the court condemn the actions of this officer in the course of its discussion of this Fourth Amendment issue. Thank you, Your Honor. Thank you, Mr. Berman. Mr. Orenberg. Thank you, Your Honor. I did cede some of my rebuttal time to Mr. Berman, but I'm prepared to address one thing that Mr. Rotker said to the court, and I don't think he meant to do this intentionally. There was something seized when the police officers went to my client's home on Spring Hill Court Road in Greenbelt, Maryland. They seized the cell phone. They seized the cell phone. And then I went on to, in my brief, to argue that the warrant for the – then the police officers got a warrant for the cell phone to download the contents, and I went on to argue that that warrant was insufficient because it lacked the particularity requirements and everything else for the obtaining of that search warrant. So there was something that was seized, and we are challenging that the warrant – all three – the Facebook account, the residence, and the cell phone. The court doesn't have any further questions. Thank you, Your Honors. Thank you very much, sir. We really appreciate you. Mr. Byrne? Very quickly, Your Honor. Mr. Byrne, you're the public defender in the Public Defender's Office in West Virginia. Yes, Your Honor. And you got into this case on appeal to assist us in the judicial system. Is that correct? Yes, Your Honor. We're always happy to take a cold record case from the Fourth Circuit. Going back to a point that Judge Heitens asked about at the beginning, on Joint Appendix 1879, that's the district court ruling on the Rule 33 motion, and the judge specifically says it was raised in front of the jury, the jury heard it, and I don't see how that alone can justify a Rule 33 new trial motion. So there was a specific reasoning given on the new trial motion being denied. Right, and so the reason she gave is, I don't see how that, what she calls a good point, how that alone is justification for granting a Rule 33 motion. Why isn't that a perfectly . . . In fact, not only why isn't that a perfectly plausible account of what the district court was saying there, it seems to me the most likely account of what the district court was saying there. I don't see . . . you raise a point, I acknowledge you raise a point, but I don't think that good point alone is enough for me to grant you Rule 33, really. I think because in the way the district court explains its decision, it's relying on the fact that the jury heard it and the jury made the decision. It is not saying independently, I agree with the jury. Well, except the district court literally just said earlier that the district court was aware that it could reweigh the evidence, right? The district court didn't misstate the . . . I mean, we get a lot of cases where the district court literally just . . . Rule 29, Rule 33, those motions are denied. That is literally all the district court judge says. Here the district court actually says the Rule 29 standard, walks through the Rule 29 analysis, and then pivots, I'll quote it, the district court says the Rule 33 standard is different. The district court says that. Then the court articulates the Rule 33 standard. Given that, why shouldn't we . . . to the extent that alone is ambiguous, why should we not interpret that in a way that suggests the district court understood the legal standard, not that it didn't understand the legal standard? Because I think when the district court makes its decision, it doesn't apply that standard. My time's up. Thank you, Your Honors. Thank you, Mr. Byrne. We appreciate the counsel's work in this case. We recognize that it's a tough case to work on as a lawyer, probably. We're going to come down and greet counsel. We're going to adjourn court for the day, come down and greet counsel. We're going to step out for about ten minutes and have a meeting among ourselves. Then we're going to come back in and meet with the students for a few minutes. Madam Clerk. This honorable court stands adjourned. Signed, aye. God save the United States and this honorable court.
judges: Robert B. King, Roger L. Gregory, Toby J. Heytens